**ARMCO STEEL CORPORATION,**
**Plaintiff,**

v.

**Maurice H. STANS, Secretary of Commerce, as Chairman and Executive Officer of the Foreign-Trade Zones Board, David M. Kennedy, Secretary of the Treasury, and Stanley R. Resor, Secretary of the Army, as members of the Foreign-Trade Zones Board and otherwise, and Richard H. Lake, as Executive Secretary, Foreign-Trade Zones Board, Defendants.**

**Equitable Equipment Company, Inc.**
**and**
**Central Gulf Steamship Corporation,**
**Intervenors.**

**No. 68 Civ. 4416.**

United States District Court
S. D. New York.
June 19, 1969.

Breed, Abbott & Morgan, New York City, for plaintiff, Edward J. Ross, Miriam C. Feigelson, New York City, of counsel.

Robert M. Morgenthau, U. S. Atty. for the Southern District of New York, Yale L. Rosenberg, Michael D. Hess, Asst. U. S. Attys., for defendants, Karl E. Bakke, Dept. of Commerce, of counsel.

Smathers, Merrigan & O'Keefe, Washington, D. C., Edward L. Merrigan, Washington, D. C., of counsel, Bigham, Englar, Jones & Houston, New York City, J. Joseph Noble, New York City, of counsel, for intervenors.

## OPINION

BONSAL, District Judge.

Armco Steel Corporation (Armco) seeks a declaratory judgment holding unlawful and setting aside an order issued on November 19, 1968 (the Order) by the Foreign-Trade Zones Board (the Zones Board) granting the Board of Commissioners of the Port of New Orleans (the New Orleans Board) the right to set up a foreign-trade sub-zone (sub-zone). Jurisdiction is based upon 28 U.S.C. § 2201 and 28 U.S.C. §§ 1331(a), 1337, and 1340.

Congress established the Zones Board in 1934 (Foreign Trade Zones Act, 48 Stat. 998 et seq., 19 U.S.C. §§ 81a et seq.), consisting of the Secretary of Commerce, as Chairman, and the Secretaries of the Treasury and of the Army. The Zones Board is authorized to "grant to corporations the privilege of establishing, operating, and maintaining foreign-trade zones in or adjacent to ports of entry under the jurisdiction of the United States." (19 U.S.C. § 81b(a).) "Corporations" may be public or private (§ 81a(d)).

A foreign-trade zone (zone) is a duty-free area within the United States where foreign and domestic "merchandise" may be, among other things, stored, manipulated, manufactured, and exhibited. 19 U.S.C. § 81c; 15 C.F.R. § 400.101. If merchandise which is brought duty-free into a zone is subsequently imported into the customs territory of the United States from a zone, the applicable duty must be paid. However, no duty need be paid if the merchandise is reshipped from the zone to a foreign country. A sub-zone is an adjunct to a zone and is used for "one or more of the specialized purposes" for which a zone can be used. 15 C.F.R. § 400.304.

At present, ten zones, used for general purposes, and five sub-zones, used for specialized purposes, have been established by the Zones Board in the United States. Foreign-Trade Zone No. 2, located in New Orleans, Louisiana, was established in 1947, and is under the administration of the New Orleans Board. The sub-zone authorized by the Order is a noncontiguous adjunct to Foreign-Trade Zone No. 2.

The saga of the sub-zone commenced in October 1967 when the New Orleans Board was approached by representatives of Equitable-Higgins Shipyard, Inc. (Equitable) to explore the possibility of establishing a sub-zone in the Equitable shipyard[1] for the specialized purpose of manufacturing barges to be used aboard LASH. vessels.[2] After receiving bids from Equitable and other domestic and foreign shipbuilders, Central Gulf Steamship Corporation (Central Gulf) entered into a contract with Equitable on January 17, 1968 under which Equitable was to build 233 barges to be manufactured out of steel plates

---

1. The Equitable shipyard is located on a tract of land owned by the New Orleans Board and leased to Equitable.

2. A LASH vessel is a high-speed cargo vessel equipped with a crane to pick up and carry on board "lighters" or barges. The barges are loaded at inland waterway ports with goods bound for foreign ports; the barges travel along the inland waterways to a port of entry where the barges are loaded on board the LASH vessel. They are carried to other ports of entry where they are unloaded and then travel into inland waterway ports to discharge their goods and pick up new goods. Using barges, a LASH vessel can be fully loaded or unloaded within 24 hours, compared to 10 days for a conventional vessel. See N.Y. Times, April 20, 1969, § 3 (Business and Finance), at 1.

imported from Japan, Equitable to use its "best efforts" to insure that a subzone would be established in New Orleans for the construction of the barges. The contract price assumed that the steel plates from Japan would be brought into the sub-zone without payment of customs duties, and that the completed barges, as "vessels," would enter the customs territory of the United States duty free.

On March 18, 1968, the New Orleans Board applied to the Zones Board for the establishment of the sub-zone in a 3.64 acre area within the Equitable shipyard. In the application, the New Orleans Board stated that the existing zone in New Orleans was operating at near maximum capacity and was not able to accommodate the equipment or facilities needed to manufacture the barges.

Hearings on the application were conducted by the Examiners' Committee of the Zones Board in New Orleans on May 22 and 23, 1968. Testimony was taken from representatives of the New Orleans Board, Equitable, and Central Gulf, and others in favor of the application, and from representatives of Armco, Bethlehem Steel Corporation, and the Shipbuilders Council of America in opposition. On June 5, 1968, the Examiners' Committee issued its report recommending that the Zones Board grant the subzone application.

On November 19, 1968, the Zones Board issued the Order authorizing the establishment of the sub-zone in New Orleans, and made Findings of Fact in support of its Order.

Thereafter, Armco instituted this action and moved for summary judgment. Intervenors Equitable Equipment Company, Inc.[3] and Central Gulf move for summary judgment, dismissing the complaint, and the defendants, Maurice Stans, Secretary of Commerce, David Kennedy, Secretary of the Treasury, Stanley Resor, Secretary of the Army, and Richard Lake, Executive Secretary of the Zones Board (the defendants), join in the intervenors' motion for summary judgment dismissing the complaint.

There is no dispute as to the facts, and the parties agree that summary judgment may be granted.

STANDING

Intervenors and defendants urge that they are entitled to summary judgment on the ground that Armco lacks standing to bring this action.

"The fundamental aspect of standing is that it focuses on the party seeking to get his complaint before a federal court and not on the issues he wishes to have adjudicated. * * * [T]he question is whether the person whose standing is challenged is a proper party to request an adjudication of a particular issue and not whether the issue itself is justiciable.

* * * * * *

[However,] it is both appropriate and necessary to look to the substantive issues for another purpose, namely, to determine whether there is a logical nexus between the status asserted and the claim sought to be adjudicated." Flast v. Cohen, 392 U.S. 83, 99, 100, 102, 88 S.Ct. 1942, 1952, 20 L.Ed.2d 947 (1968).

Armco's position is that, as a domestic steel manufacturer, it will be economically injured by the Zones Board's Order in that Equitable, a shipbuilder to whom Armco formerly sold steel, will be able to import Japanese steel into the subzone for the manufacture of barges without the payment of the 7½% customs duty on foreign steel, 19 U.S.C. § 1202, and will thereafter be able to import barges into the customs territory of the United States, again without the payment of customs duties, in violation of the Act and tariff laws of the United States. Thus, Armco complains that the Zones Board's Order will have the effect

---

3. Subsequent to the Zones Board's Order, Equitable-Higgins Shipyards, Inc. was merged into Equitable Equipment Company, Inc. Hereafter, both will be referred to as Equitable.

of illegally fostering competition between itself and Japanese steel manufacturers; that other domestic shipbuilders will be placed at a competitive disadvantage by Equitable's ability to import Japanese steel at a cost below that of domestic steel or foreign steel on which duty is paid; and that other domestic manufacturers may be forced to compete with foreign manufacturers whose goods can be shipped into zones duty-free.

While "economic injury which results from lawful competition cannot, in and of itself, confer standing on the injured business to question the legality of any aspect of its competitor's operations". Hardin v. Kentucky Utilities Co., 390 U.S. 1, 5–6, 88 S.Ct. 651, 654, 19 L.Ed.2d 787 (1968); Perkins v. Lukens Steel Co., 310 U.S. 113, 60 S.Ct. 869, 84 L.Ed. 1108 (1940); Tennessee Electric Power Co. v. T.V.A., 306 U.S. 118, 59 S.Ct. 366, 83 L.Ed. 543 (1939); Alabama Power Co. v. Ickes, 302 U.S. 464, 58 S.Ct. 300, 82 L.Ed. 374 (1938), judicial review is available for "economic injury" where the plaintiff "can show the existence of a 'statutory aid to standing' for a class of persons which includes himself." Arnold Tours, Inc. v. Camp, 408 F.2d 1147, 1150 (1st Cir., March 27, 1969).

While the Foreign-Trade Zones Act (the Act) does not specifically provide for judicial review of orders of the Zones Board, judicial review may be had "unless there is persuasive reason to believe that [no judicial review] was the purpose of Congress." Abbott Laboratories v. Gardner, 387 U.S. 136, 140, 87 S.Ct. 1507, 1511, 18 L.Ed.2d 681 (1967); Norwalk CORE v. Norwalk Redevelopment Agency, 395 F.2d 920, 932 n. 25 (2d Cir. 1968).

There is a "basic presumption" embodied in the Administrative Procedure Act in favor of "judicial review to one 'suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute,' 5 U.S.C. § 702," unless such review is precluded by statute or the action is committed to agency discretion, 5 U.S.C. § 701(a).

Abbott Laboratories v. Gardner, *supra* 387 U.S. at 140, 87 S.Ct. at 1511.

■ Nothing in the legislative history of the Act indicates that Congress intended to preclude judicial review of Zones Board orders; and while the action of the Zones Board, in establishing the sub-zone, involved some degree of discretion, it is not the type of agency action which a court is precluded from reviewing. See Long Island R.R. v. United States, 140 F.Supp. 823 (E.D.N.Y. 1956) (three-judge court); see also Knight Newspapers, Inc. v. United States, 395 F.2d 353 (6th Cir. 1968).

The meaning of "legal wrong * * * or adversely affected or aggrieved * * * within the meaning of a relevant statute," 5 U.S.C. § 702, has been considered in a number of cases, see, e. g., Curran v. Clifford (D.C. Cir., Dec. 27, 1968), opinions vacated and case scheduled for rehearing en banc sub nom. Curran v. Laird (D.C.Cir., April 3, 1969); Arnold Tours, Inc. v. Camp, 408 F.2d 1147 (1st Cir. 1969); Wingate Corporation v. Industrial National Bank, 408 F.2d 1147 (1st Cir. 1969); Association of Data Processing Service Organizations, Inc. v. Camp, 406 F.2d 837 (8th Cir. 1969); Norwalk CORE v. Norwalk Redevelopment Agency, 395 F.2d 920 (2d Cir. 1968).

In Norwalk CORE v. Norwalk Redevelopment Agency, *supra* at 933 n. 26, this Circuit stated that it would

"consider any person attempting to assert an interest, personal to him, which the 'relevant statute' was specifically designed to protect, and which he claims is not being protected, as 'adversely affected or aggrieved' within the meaning of that statute."

This interpretation of the Administrative Procedure Act is consistent with the view expressed by Professor Jaffe of the requirements for standing in "economic injury" cases: "Where [Congress] has recognized a certain 'interest' as one

which must be heeded, it is such a 'legally protected interest' as warrants standing to complain of its disregard." Jaffe, Judicial Control of Administrative Action 508 (1965). It is also consistent with the view expressed by the Supreme Court in an "economic injury" case which did not involve the Administrative Procedure Act: "[Where] the particular statutory provision invoked does reflect a legislative purpose to protect a competitive interest, the injured competitor has standing to require compliance with that provision." Hardin v. Kentucky Utilities Company, 390 U.S. *supra* at 6, 88 S.Ct. at 654.

The question, therefore, is whether the Act protects domestic manufacturers from foreign competition resulting from the use of zones. Armco concedes the primary purpose of the Act when it was passed in 1934 was to "expedite and encourage foreign commerce" by facilitating transshipment of foreign merchandise, and by assisting the American merchant marine.

However, the debate prior to its passage indicated concern as to the effect of foreign-trade zones on domestic industry. For example, the following colloquy is reported in 78 Cong.Rec. 9767–9768 (1934):

"Mr. Holmes.

\* \* \* Now, will the free zones make it possible for foreign steel manufacturers to dump an unlimited amount of their steel into these ports for the consumption of the people of the United States in competition with domestically manufactured steel?

"Mr. Cullen. That most certainly is not the intention of the bill.

\*   \*   \*   \*   \*   \*

The establishment of such zones in the ports of entry of the United States will, in no way interfere with or change existing tariffs, and is in no way an entering wedge for the dumping of foreign products in competition with our domestic products. \* \* \* [T]he creation of such zones will [not] in any way adversely affect

our domestic markets, or enable foreign products to avoid our tariff levies and compete with domestic products."

The foregoing indicates a Congressional intent that the Act not injure domestic steel manufacturers and not diminish the protection which the tariff laws afford to domestic steel manufacturers.

In 1950, the Act was amended to eliminate the provisions excluding manufacturing and exhibiting in zones. The effect of zones on domestic industry was again discussed, as for example:

"Mr. Cooper. Well, what about the competitive feature of the thing. I assume that the foreign-trade zone authority would grant permission to manufacturer A to set up a plant and do manufacturing within the zone, whereas manufacturers B, C, D, and E, outside of the zone, might not get permission or might not be able to carry on their manufacturing process within the zone. How about the competitive feature of it, so far as American business is concerned?

"Mr. Celler.

\* \* \* I am sure [the Zones Board] would endeavor to equalize it so that there would not be any unfair competitive features in that regard. \* \* \* I think the Foreign-Trade Zone Board, in its discretion, would act fairly and equitably in that regard \* \* \*" Hearings on H.R. 6159 and H.R. 6160 Before the House Committee on Ways and Means, 80th Cong., 2d Sess., at 16–17 (1948) (The 1948 Hearings).

Thus, in both the 1934 Act and the 1950 Amendments, the concern of Congress that the zones not be utilized to foster competition with domestic industry and that the Act not be used to deny the protection of the tariff laws to domestic industry, was evident. As Congressman Celler, the author of both the 1934 Act and the 1950 Amendment, stated:

"[T]here is no conflict between the principle of the foreign-trade zone and

our tariff laws. *The Foreign Trade Zone Act synchronizes with the tariff laws.* The former is set up to 'expedite and encourage foreign trade,' and the latter is set up to provide revenue and to regulate commerce with foreign countries, to encourage industries, and to protect American labor * * *" (The 1948 Hearings, p. 12) (Emphasis added).

■ Since Armco contends that the Zones Board by its Order is denying it the protection accorded by the tariff laws, and is using the Act to foster competition between domestic and foreign steel manufacturers, it has standing to bring this action.

## ARMCO'S MOTION FOR SUMMARY JUDGMENT

Armco argues that the Zones Board's Order is illegal because

1) the Act does not authorize the construction of vessels in a zone or sub-zone;

2) the Order nullifies the tariff laws and enables Equitable to evade customs duties;

3) the sub-zone cannot be operated as a "public utility," as required by the Act, since it will be used solely by a private corporation;

4) the Zones Board's findings of fact are insufficient and are not based on substantial evidence; and

5) the real applicant for the sub-zone is Equitable, not the New Orleans Board.

1. *The Act does not authorize the construction of vessels in a zone or subzone.*

Section 3 of the Act (as amended in 1950), 19 U.S.C. § 81c, provides:

"Foreign * * * merchandise of every description, except such as is prohibited by law, may, without being subject to the customs laws of the United States * * * be brought into a zone and may be * * * manufactured except as otherwise provided in this chapter, and be * * * sent into customs territory of the

United States therefrom, in the original package or otherwise; but when foreign merchandise is so sent from a zone into customs territory of the United States it shall be subject to the laws and regulations of the United States affecting imported merchandise * * *."

The Regulations promulgated by the Bureau of Customs with respect to Foreign-Trade Zones provide:

"Merchandise which is specifically and absolutely prohibited by law shall not be admitted into a zone.

* * * * * *

"When merchandise * * * is to be transferred from a zone to customs territory, the grantee shall make an application to the collector * * * The applicant shall * * * include a complete identification of the merchandise as it entered the zone, including the lot numbers, marks and numbers of the packages, status of each lot, description, and quantities. If any change in respect of any of the foregoing items of identification occurred while the merchandise was in the zone, the current information with respect to each item which has been changed shall also be stated." (19 C. F.R. §§ 30.1, 30.14(g).)

Armco contends that barges, which are vessels, are not "merchandise" under the Act and "manufacture" as used in the 1950 Amendment does not include the construction of vessels. The argument is that "merchandise" is synonymous with "articles" and that, under the tariff laws, vessels are not "articles." The Conqueror, 166 U.S. 110, 17 S.Ct. 510, 41 L.Ed. 937 (1897).

However, the Tariff Act of 1930 does not say that "vessels" are not "articles," as Armco urges, but only that "vessels * * * are not articles subject to the provisions of [the tariff] schedules," 19 U.S.C. § 1202, Headnote 5(e). Section 607 of the Tariff Act of 1930, 19 U.S.C. § 1607, provides,

"If [the] value of *such vessel*, vehicle, merchandise, or baggage * * *

does not exceed $2,500, the collector shall cause a notice of the seizure *of such articles * * * to be published * * *."* (Emphasis added.) indicating that vessels are articles for other purposes. See also 19 U.S.C. § 1608.

■ While the Act prohibits the manufacture of tobacco products, playing cards, matches, explosives, and munitions, or the distillation of liquor in a zone, there is nothing in the Act, Regulations, or the tariff laws which prohibits merchandise such as steel plates from being manufactured into non-dutiable articles such as barges. Indeed, Section 309 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1309, and the Regulations issued pursuant to the Act, contemplate that articles suitable for use on certain classes of vessels as supplies, equipment, or repair material may be manufactured within a zone, and withdrawn therefrom duty-free. See Canadian Nat. SS Co. v. United States, 148 F.2d 1001, 1002, 29 CCPA 132 (1941); 19 C.F.R. § 30.16(a). Thus, the manufacture of non-dutiable barges in zones is authorized.

2. *The Order nullifies the tariff laws and enables Equitable to evade customs duties.*

Armco argues that it was a primary concern of Congress that a zone not become a "hole in the tariff wall." It suggests that Equitable could use foreign steel to repair American vessels in the sub-zone, thus avoiding the customs duties prescribed by 19 U.S.C. § 257,[4] and that to allow "heavy manufacturing" in a sub-zone would lead to the importation of foreign dutiable machine tools and equipment for such manufacturing, thus enabling Equitable to avoid duty thereon and undercut its competitors.

■ However, the Zones Board's Order provides only for the manufacture of vessels and not their repair. Since Congress intended that manufacturing could be carried on in the sub-zones and did not prohibit the use of foreign-built machine tools and equipment, such use is not prohibited by the Act. Equitable represents that it will use domestic machine tools and equipment in the sub-zone. Since the Act authorizes the manufacture of the barges in the sub-zone, this court may not find that such manufacture is a "hole in the tariff wall." This consideration of national policy can only be determined by Congress.

3. *The sub-zone cannot be operated as a "public utility," as required by the Act, since it will be used solely by a private corporation.*

19 U.S.C. § 81n provides:

"Each zone shall be operated as a public utility * * * and the grantee shall afford to all who may apply for the use of the zone and its facilities and appurtenances uniform treatment under like conditions * * *."

Pointing out that the sub-zone is located in Equitable's shipyard and will operate at full capacity for some years to fill Central Gulf's order for the construction of barges, Armco contends that it is not a public utility, and that no one other than Equitable may apply for the use of the facility on equal terms, despite the offer of the New Orleans Board to make available "other sites that could be developed for similar purposes."

The sub-zone, as the name implies, is but a non-contiguous portion of the original general purpose zone established in 1947. In issuing the Order, the Zones Board found that the general purpose zone was operating at full capacity on

---

4.  19 U.S.C. § 257 provides:
    "* * * the repair parts of materials to be used * * * upon a vessel documented under the laws of the United States to engage in the foreign or coasting trade, or a vessel intended to be employed in such trade, shall, on the first arrival of such vessel in any port of the United States, be liable to entry and the payment of an ad valorem duty of 50 per centum on the cost thereof in such foreign country * * *."

its 18.58 acres in the Port of New Orleans, which was the reason that the New Orleans Board had applied for and the Zones Board had authorized the establishment of the sub-zone. An earlier sub-zone, which was to contain a petrochemical manufacturing plant under the operation of the Union Carbide Corporation, had previously been authorized in Taft, Louisiana, about 25 miles from New Orleans.

■ The obligation of the New Orleans Board to provide "uniform treatment under like conditions" (15 C.F.R. § 400.1003(a)) to those who apply for use of the zone, or if the general purpose zone is unable to accommodate the applicants, for the establishment and use of additional sub-zones, will be satisfied if, upon application, the New Orleans Board meets its commitment that it is

"* * * prepared to offer other areas in the Port that could be developed for similar purposes and is also ready and willing to extend to others, who may own or occupy already developed sites, the same arrangements under similar terms and conditions as the present grantee's lessee [Equitable]."

Armco contends that the Regulation of the Zones Board authorizing the "establishment of * * * a sub-zone in an area separate from an existing zone, for one or more of the specialized purposes of storing, manipulating, manufacturing, or exhibiting goods * * *" (15 C.F. R. § 400.304) does not allow the Zones Board to establish a sub-zone for the exclusive benefit and sole purposes of one business firm.

However, this Regulation was designed to further the purposes of the 1950 Amendment, authorizing manufacture and exhibition of goods within a zone. See Foreign-Trade Zones Board, 14th Annual Report to Congress, July 16, 1953, p. 7. The Zones Board's Annual Reports show that private corporations, such as Sears Roebuck & Co., and others carry on their activities within general purpose zones. There is nothing in the Act indicating a different rule in sub-zones, where the general purpose zone lacks adequate services and facilities.

4. *The Zones Board's findings of fact are insufficient and are not based on substantial evidence.*

In the hearing conducted by the Examiners' Committee, representatives of the New Orleans Board and the City of New Orleans testified, and introduced exhibits which indicated, that the sub-zone would create substantial employment opportunities in Louisiana, would foster an increased movement of goods through the Port of New Orleans, and would assist in reducing the balance of payments deficit of the United States.

An officer of Central Gulf testified that the LASH vessel and barge system would be a revolutionary step in shipping and would permit the so-called "mother ship" to "shuttle between U.S. and foreign ports without being tied up because of unloading delays and port congestion" and that Central Gulf believed that "its inauguration of the LASH type service will introduce substantial efficiency in ocean shipping and stimulate the U.S. foreign trade * * *"

A representative of the New Orleans Board also testified that the "existing zone does not have available space for the contemplated operations. The nearest waterfront is neither suitable nor available for the specific purposes. It is not fitted with necessary equipment and facilities."

Those opposing the establishment of the sub-zone stated that it would invite greater deficits in balance of payments, reduce domestic revenues, and thwart national full employment policies. However, the basic argument raised by opponents of the sub-zone was that it was not the intent of Congress to allow this type of zone to be established. The opponents produced no evidence that the existing zone could accommodate the proposed operations.

In the report submitted to the Zones Board, the Examiners' Committee reviewed the testimony and exhibits and made the following relevant findings and conclusions:

"The starting up of the subzone site will be of substantial economic importance to the City of New Orleans and the port of New Orleans, the State of Louisiana and make some economic contribution nationally.

"The LASH system will aid in making a positive contribution to the U.S. balance of payments problem by way of the value added in the United States. In addition, construction of the barges in the United States through the foreign-trade zone mechanism will reduce payments to foreign countries because of reduced port and stevedoring charges.

\*   \*   \*   \*   \*   \*

"Operation of a shipyard in a foreign-trade zone would not interfere with the protection of the revenue.

\*   \*   \*   \*   \*   \*

"Approval of the instant application would result in local, regional and national economic benefits."

In issuing its Order, the Zones Board made two basic findings: first, that the "proposed plans and location are suitable for the establishment and operation of the sub-zone;" and second, that the general purpose zone "will not serve adequately the convenience of commerce with respect to the proposed purpose of such a sub-zone."

Armco contends that these findings do not comply with the requirements of the Act and Regulations which provide that the Zones Board must find that the

"proposed plans and location are suitable for the accomplishment of the purpose of a foreign trade zone" (19 U.S.C. § 81g)

and that the

"existing or authorized zones will not adequately serve the convenience of commerce" (19 U.S.C. § 81b(b))

"with respect to the proposed purposes [of the sub-zone]" (15 C.F.R. § 400.304).

■ The Zones Board's findings, which vary only slightly in wording, comply with the requirements of the Act and Regulations.

Armco goes on to argue that the findings of fact which the Zones Board made are not based on substantial evidence and that there was no evidence before the Zones Board from which it could conclude that the sub-zone will accomplish the purpose of a foreign-trade zone; or that the existing general purpose zone will not adequately serve the convenience of commerce.

■ However, since the findings of the Zones Board were based on substantial evidence and satisfied the requirements of the Act and Regulations, they are not subject to judicial review. Universal Camera Corp. v. N.L.R.B., 340 U. S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951); Boston and Maine R.R. v. United States, 208 F.Supp. 661 (D.Mass.), aff'd, 371 U.S. 26, 83 S.Ct. 117, 9 L.Ed. 2d 95 (1962); Matson Navigation Co. v. Connor, 258 F.Supp. 144 (N.D.Calif. 1966).

5. *The real applicant for the sub-zone is Equitable, not the New Orleans Board.*

Armco argues that since Equitable approached the New Orleans Board for the establishment of a sub-zone in its shipyard, the New Orleans Board is merely a nominal applicant for Equitable. Armco further argues that the Order designating Equitable as the "operator" is illegal in that only the grantee, the New Orleans Board, can operate the zone (15 C. F.R. § 400.1000).

■ However, the Act and the Regulations provide that the nature of the operations contemplated for performance in the sub-zone must be specified in detail in the application (19 U.S.C. § 81f; 15 C.F.R. §§ 400.600–400.609). The Act is not violated because the New Orleans Board had in mind a specific user for the proposed sub-zone. Thus, in the

28th Annual Report of the Zones Board to Congress, the New Orleans Board stated that it

"continued its efforts to expand foreign commerce as part of the Grantee's overall trade development program for the Port of New Orleans. Promotional efforts included widespread distribution of literature describing zone features and extensive contact with representatives of business firms. The excellent facilities of the Port of New Orleans include the zone and port areas as well as other areas available for use as new sites."

Therefore, whether the initiative for the establishment of the sub-zone came from the grantee of the general purpose zone, the New Orleans Board, or Equitable, is immaterial. Throughout all proceedings, the applicant in fact was the New Orleans Board and when the application was granted, it was not Equitable, but the New Orleans Board, which was granted

"the privilege of establishing, operating, and maintaining a foreign-trade sub-zone * * * subject to the provisions, conditions, and restrictions of the Act and of all rules and regulations made thereunder * * *"

In addition to authorizing the sub-zone involved here, the Zones Board has authorized two other manufacturing sub-zones in Puerto Rico and San Francisco, each of which has for several years been operated by a single private corporation (Union Carbide Caribe, Inc. in Puerto Rico, and Lilli Ann Corporation in San Francisco), and it has under consideration an application for a sub-zone at Machiasport, Maine, for the refining of foreign crude oil by a single private corporation (Occidental Petroleum) for importation to and distribution in the United States. (See Sinclair Oil Corp. v. Smith, 293 F.Supp. 1111 (S.D. N.Y.1968).)

The issues raised by Armco present important questions of national policy which are receiving current attention. For example, the proposal to establish a sub-zone in Machiasport, Maine for the construction of an oil refinery using foreign crude oil has raised considerable opposition on the part of domestic oil producers.[5] Domestic manufacturers and producers are deeply concerned that the Act will become a vehicle for untoward foreign competition in the domestic market. These matters of national policy are for the Congress to consider and determine, and not for the courts.

For the foregoing reasons, the Order establishing the New Orleans sub-zone does not violate the Act and may not be set aside.

The foregoing constitutes the court's findings of fact and conclusions of law.

Armco's motion for summary judgment is denied. Intervenors Equitable and Central Gulf's motion for summary judgment dismissing Armco's complaint, which is joined in by the defendants, is granted.

It is so ordered.

---

5. See, e. g., N.Y. Times, Jan. 6, 1969, at 26, col. 2; Jan. 11, 1969, at 39, col. 4; Feb. 21, 1969, at 1, col. 4; Mar. 27, 1969, at 65, col. 2.