431 F.2d 779
 1 ITRD 1302
 ARMCO STEEL CORPORATION, Plaintiff-Appellant,
v.
Maurice H. STANS, Secretary of Commerce, as Chairman and
Executive Officer of the Foreign-Trade Zones Board, David M.
Kennedy, Secretary of the Treasury, and Stanley R. Resor,
Secretary of the Army, as members of the Foreign-Trade Zones
Board and otherwise, and Richard H. Lake, as Executive
Secretary, Foreign-Trade Zones Board, Defendants-Appellees,
Equitable Equipment Company, Inc., and Central Gulf
Steamship Company, Intervenors-Appellees.
 No. 671, Docket 34043.
 United States Court of Appeals, Second Circuit.
 Argued April 9, 1970.
Decided Aug. 17, 1970.
 
 Edward J. Ross, Miriam C. Feigelson, Breed, Abbott & Morgan, New York City, for plaintiff-appellant.
 Yale L. Rosenberg, David Paget, Asst. U.S. Attys., Whitney North Seymour, Jr., U.S. Attorney, New York City, for defendants-appellees.
 Edward L. Merrigan, Smathers, Merrigan & O'Keefe, Washington, D.C., Bigham, Englar, Jones & Houston, New York City, for intervenors-appellees.
 Before WATERMAN and ANDERSON, Circuit Judges, and WEINFELD, District Judge.*
 WATERMAN, Circuit Judge:
 
 
 1
 Plaintiff-appellant, Armco Steel Corporation (Armco), a domestic producer of steel, challenges the legality of action taken by the Foreign-Trade Zones Board (Zones Board) in granting authorization to the Board of Commissioners of the Port of New Orleans (New Orleans Board) to establish in their port a foreign trade subzone. The initial purpose of this subzone grant was to premit intervenor-appellee Equitable Equipment Company, Inc. (Equitable), a shipbuilder, to construct with duty-free steel from Japan steel barge vessels at a shipyard located within the subzone.
 
 
 2
 Foreign trade zones are areas located in, adjacent to, or nearby, ports of entry, into which foreign merchandise may be brought duty free and 'stored, sold, exhibited, broken up, repacked, assembled, distributed, sorted, graded, cleaned, mixed with foreign or domestic merchandise, or otherwise manipulated, or be manufactured. * * *' Section 3 of the Foreign Trade Zones Act, 19 U.S.C. 81c. Such merchandise, whether in altered form or not, may then 'be exported, destroyed, or sent into the customs territory of the United States. * * *' Id. If 'sent into the customs territory of the United States' the merchandise 'shall be subject to the laws and regulations of the United States affecting imported merchandise. * * *' Id.
 
 
 3
 The creation of a foreign or free trade zone for the purpose of permitting products manufactured in the zone to be subsequently imported into the United States allows an enterprise operating within the zone to take advantage of favorable differentials in the tariff schedules between the rates of duty for foreign materials used in the manufacturing process and the duty rates for the finished articles. For instance, in trade zones located in Toledo and Seattle, Volkswagen panel trucks are converted, using domestic labor and materials, into campers and are then imported. The transformation of the vehicles enables them to qualify as passenger vehicles subject to a 6.5% Duty, rather than as trucks subject to a 25% Duty. 19 U.S.C.A. 1202, Items 692.10 and 945.69.[1]
 
 
 4
 In the instant case, the savings differential is so favorable that the duty rate otherwise payable on imported steel is reduced to zero. The parties represent that the tariff on foreign steel of the type used in this case is 7 1/2%, while 'vessels which are not 'yachts or pleasure boats' * * * are not articles subject to the (tariff schedule) provisions.' Id. Headnote 5. Thus, steel may be brought into a trade zone from Japan duty free and utilized along with domestic materials to construct barges. When imported from the zone the barges are nondutiable vessels. The steel used in the construction of the vessels escapes recognition for duty purposes for it is only the end product exported from the zone, the vessels, that triggers the rate of import duty chargeable.
 
 
 5
 The events which precipitated the Zones Board's subzone grant in New Orleans and led to this lawsuit began in January 1968 when intervenor-appellee Central Gulf Steamship Corporation (Central Gulf)[2] entered into a contract with Equitable for the construction of 233 barges for use on a LASH ship being built in Japan for Central Gulf.
 
 
 6
 LASH (an acronym for 'lighter-aboard-ship') vessels are designed to modernize the foreign shipping trade. The barges serve dual purposes: one traditional, in that cargo may be loaded on a barge at any point and the barge towed to another point; the other modern, in that each barge is a container designed to be carried aboard its 'mother' ship (the LASH vessel) piggy-back style. Having a full complement of 233 barges (the number contracted for by Central Gulf to be provided by Equitable) each LASH or 'mother' ship can load and carry at one time 73 container-barges. Approximately one half of the remaining 160 barges are scheduled to load or unload cargo at various domestic ports while the others load or unload cargo at foreign destinations. The principal advantages of the LASH concept are three-fold. The barges are capable of travel over inland waterways and enable the loading and unloading of cargo at the 'doors' of various customers. Inasmuch as three sets of barges operate independently, the 'mother' ship need not delay at a port to await the return of the barges engaged in their multiple-destination journeys. Finally, because each barge is its own container, it can be expeditiously loaded onto and unloaded from the 'mother' ship by means of a crane without disturbing the barge's cargo, enabling the 'mother' ship to avoid longer in-port delays and thereby relieving port congestion. The estimated loading or unloading time when a LASH ship is operating at full capacity is 24 hours compared to the normal time of 10 days for a conventional ship. It is also anticipated that cargo damages would be reduced.
 
 
 7
 Central Gulf had also sought bids from foreign shipbuilders to construct the LASH barges in question, but decided to accept Equitable's bid even though it was somewhat higher than those submitted by foreign shipyards. Equitable's bid was competitive with foreign ones because Equitable planned to construct the barges with Japanese manufactured steel imported from Japan. Even when so imported the cost of the dutiable steel would be appreciably lower than the cost of domestic steel. And an added inducement to Central Gulf to accept Equitable's bid was the possibility that the New Orleans Board might successfully apply for a free trade subzone[3] at the site of Equitable's shipyard where the barges were to be constructed, thereby avoiding, as previously discussed, the 7 1/2% Customs duty that would otherwise be levied on the imported steel.[4] Equitable was to use its 'best efforts' toward this end and, as it turned out, Equitable's 'best efforts' paid off. The New Orleans Board applied for the establishment of a subzone[5] on March 18, 1968. Hearings were held before the Examiners Committee of the Zones Board on May 22 and 23, 1968.[6] The committee filed its Report on June 5 which contained its findings and conclusions and a recommendation to the Zones Board that the Board act favorably upon the application. After considering the Report the Zones Board[7] issued its order granting the establishment of the subzone.
 
 
 8
 Against this background Armco attacks the validity of the Zones Board's order with a variety of contentions. It contends that the Foreign Trade Zone Act, 19 U.S.C. 81a et seq., does not authorize the action taken by the Zones Board in this case because Congress did not intend the creation of a foreign trade zone: (1) to be used to avoid customs duties when as a result interested domestic industries are placed at a competitive disadvantage, (2) that cannot be operated by a public or quasi-public corporation with equal treatment under like conditions for all business concerns, (3) the purpose of which is to produce vessels because vessels are not 'articles' within the meaning of the tariff laws and products not defined as 'articles' cannot be manufactured in a trade zone, (4) wherein 'heavy' manufacturing, like ship or barge construction, is intended to be conducted for the Act contemplates that only 'light' manufacturing may take place in a foreign trade zone, and alternatively, as to this last contention, that, in any event, barge construction is not 'manufacturing' within the meaning of Section 3 of the Act.
 
 
 9
 This multi-charged assault on the New Orleans Foreign Trade Subzone involves arguments of policy which are better designed for consideration by the Congress than by a federal court. The district judge below, Judge Bonsal, concluded as much in a well-reasoned opinion reported at 303 F.Supp. 262, 272 (SDNY 1969), when Armco's complaint was dismissed upon the grant of defendant-appellees' motion for summary judgment. We agree with the lower court and affirm the judgment entered below.
 
 I.
 
 10
 Before discussing the arguments advanced by appellant Armco we dispose of a contention raised below by the defendants and intervenors, appellees here, that Armco does not have standing to challenge the legality of the Board's order because its business is not sufficiently 'aggrieved in fact' to meet the standing-to-sue requirements laid down by the Supreme Court. The district court rejected the lack-of-standing arguments and reached the merits. The defendants-appellees have abandoned this claim on appeal, but intervenors-appellees still press the point. We agree with Judge Bonsal's opinion below, 303 F.Supp. at 265-268, and agree that plaintiff has standing to sue. A recent Supreme Court case, Association of Data Processing Serv. Organizations, Inc. v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970), lends substantial support to the conclusion that Armco is a proper party to maintain this suit. Armco is not only complaining of economic injury to itself from unlawful competition, but is invoking for itself a 'statutory aid to standing' because the tariff laws are demonstrably intended to protect the competitive interest of the entire class of domestic steel producers, a class of which it is a member. See, e.g., Hardin v. Kentucky-Utilities Co., 390 U.S. 1, 88 S.Ct. 651, 19 L.Ed.2d 787 (1968).
 
 II.
 
 11
 The Foreign Trade Zones Act was passed in 1934 in the midst of the depression and has a stated purpose 'to expedite and encourage foreign commerce.' See 1950 U.S.Code Cong.Serv., pp. 2533-2534; Fountain v. New Orleans Public Service, Inc., 387 F.2d 343, 344 (5 Cir. 1967). Restrictions in the 1934 Act that no manufacturing or exhibition of merchandise was to be permitted in a trade zone were eliminated by amendment in 1950. 19 U.S.C. 81c. Appellant argues that the original purpose underlying the Act was to create transshipment zones where goods are destined for re-export, and argues that Congress surely did not intend by the 1950 amendment to that Act to allow the manufacture of merchandise in a trade zone which would then be importable duty-free into the United States in the manufactured form. We have already discussed the possibility that various manufacturers, through utilization of Foreign Trade Zones, may take advantage of differentials built into the tariff rate structure. If a 'hole' is thereby rent in 'the tariff wall,' Congress intended it, for the Foreign Trade Zones Act clearly contemplates that trade zone users may take advantage of differing rates in tariff schedules and thereby, depending on what form a product might take when imported from the zone into the U.S. customs territory, save on customs duties. The Act gives the Trade Zones Board wide discretion to determine what activity may be pursued by trade zone manufacturers subject only to the legislative standard that a zone serve this country's interests in foreign trade, both export and import. Because of the nature and complexity of the problem the factors entering into a Board determination are necessarily numerous, and it would seem incontrovertible that the Board must not be unduly hampered by judicial policy judgments that might cast doubt upon the wisdom of a particular Board decision.
 
 
 12
 The Examiners Committee weighed a number of factors posed by the evidence offered in support of, and in opposition to, the New Orleans subzone application and recommended approval of the application because, in its unanimous view, foreign and domestic trade policies were, on balance, furthered by a subzone grant. The more significant factors so considered by the Committee may be briefly stated.
 
 
 13
 A. Impact of the subzone on the domestic steel industry. The single most important factor weighing in favor of a denial of the subzone sought in this case was the fact that U.S. steel producers would lose whatever competitive protection was afforded them by the customs tariff on imported steel. The examiners concluded, however, that, in view of the small proportion (approximately 1.0%) of domestic steel used by the shipbuilding industry compared to the steel industry's total steel mill product shipments in the past 10 years, the steel industry would not be significantly hurt if that protection were lost. Furthermore, barges of the type used in conjunction with LASH ships are primarily designed to operate in foreign commerce, and therefore may be built in foreign shipyards if the barges do not subsequently engage in U.S. coastwise and inland waterway trade. 46 U.S.C. 883.[8] Foreign shipbuilding costs have been estimated to be lower than domestic. It seems likely, then, that if the competitive advantage of a trade zone were not made available to domestic shipbuilders, LASH barges would be manufactured by foreign shipbuilders with foreign produced steel. It follows, therefore, that the granting of the subzone in this case would not appear significantly to alter the U.S. steel producers' ability to compete in the steel market for LASH vessels and barges.
 
 
 14
 B. Balance of Payments. As has already been pointed out, the Committee recognized that Central Gulf was not obligated to contract with a domestic shipbuilder for the complement of barges needed on its Japanese-built LASH 'mother' vessel.[9] Hence, should Central Gulf or any other shipowner contract with foreign shipbuilders to construct LASH barges because domestic shipbuilders could not compete with foreign bids, the payments for the entire cost of the barges would flow out of this country. On the other hand, if these barges were built in domestic shipyards only the cost of the steel used in their manufacture would be paid to foreign industrialists and only those payments would adversely affect the nation's balance of payments. The remainder of the construction cost of the barges would be wages paid to American labor and payments for home-produced materials and supplies.
 
 
 15
 Furthermore, the Examiners Committee found that a concomitant advantage to our balance of payments would result as soon as the LASH ships and barges are in active service. The LASH concept of overseas cargo-carrying would seem to promise advantages to domestic manufacturers in facilitating the shipment of their products to foreign countries. Door-to-door service and the savings in shipping costs which we have discussed in detail supra were found to result in the likelihood of bolstering our competitive markets in foreign countries, thereby increasing our foreign sales, and thus leading to a commensurate alleviation in our balance of payments problem.[10]
 
 C. Other factors considered:
 
 16
 Other obvious advantages inherent in the stimulation of domestic production of LASH vessels through use of a free trade zone which the committee commented upon need only be briefly mentioned, as: (1) more jobs for the domestic work-force, (2) stimulation of related industries supplying the shipbuilder, (3) advance of our shipbuilding technology, skill and production line techniques through experience,[11] and (4) a boost to the economy of the City of New Orleans and the State of Louisiana.
 
 
 17
 We now turn to a more subtle attack Armco has directed at the Zones Board action, an attack based upon the declared congressional policy of encouraging shipbuilding by domestic shipbuilders.
 
 
 18
 In addition to its claim of illegal competitive disadvantagement caused by an alleged misinterpretation of the permissible scope of Section 3 of the Foreign Trade Zones Act, appellant challenges the legality of a subzone to build LASH barges by an allegation that Central Gulf intended Equitable to build the barges with Japanese steel irrespective of whether a subzone was established. Armco points out, of course, that the parties so contracted. From this premise Armco concludes that the real reasons for providing that the barges be domestically built regardless of foreign bids were (1) a savings could be realized even if Japanese steel were used and a duty was paid thereon and, more importantly, (2) the U.S. barge owners of U.S. constructed barges could broaden the use of the barges by carrying on U.S. coastwide and inland waterway trade in addition to having them to use in foreign commerce because the requirements of 46 U.S.C. 883 would be met. 46 U.S.C. 883 is one of the statutory sections dealing with the registry provisions of the shipping laws, and the section, as we have said, requires vessels used in the inland waterway and coastal trade to be owned by U.S. citizens, to be registered under the U.S. flag, and to have been 'built in' the United States.[12] Therefore Armco reasons to a conclusion that domestic shipbuilders, and Equitable in particular, are not, and cannot be, in competition with foreign shipbuilders in the construction of LASH barges, because if the barges are to be used in the coastwise trade they cannot be foreign-built barges. Thus, according to appellant, the economic factors the Trade Zones Board considered were significant enough to warrant the grant of the subzone for the purpose of building LASH barges there from duty-free steel are immaterial factors. Armco argues that Congress could not have intended the anomaly created by allowing domestic shipbuilders to save customs duties on foreign steel when, in any event, the vessels utilizing such steel would be built in domestic shipyards. It says that the Board's grant did not have the effect of stimulating the domestic economy and employment and of affecting favorably our balance of payments, and the only realistic effect of the Board's grant is to nullify a tariff on steel which Congress had levied. In short, Armco contends that the Board in this case granted Equitable a subsidy under the guise of the creation of a free trade zone, something the Act does not contemplate. Under the circumstances of this case, as posed by Armco, such considerations are irrelevant inasmuch as the posture of foreign and domestic commerce is not altered from the posture before the subzone grant.
 
 
 19
 Although the unique registry provision of the shipping laws, 46 U.S.C. 883, which on its face would seem to allow U.S. owners of the LASH barges in question to engage in the coastwise and inland waterway trade, weakens the strength of the fabric of factors considered and weighed by the Board, we do not conclude it to be of controlling significance. There is substantial evidence that Central Gulf did not award Equitable the construction contract to the exclusion of foreign shipbuilders because of the registry provisions and because of a desire to engage primarily in other than foreign commerce. The principal utility of the LASH concept is interocean container shipping of cargo. While it is possible for LASH barges to engage in inland waterway and coastwise trade, the Examiners Committee found that 'there is no certainty that the recipient of the current group of lighters will in fact actually use the lighters in the coastwise trade' and it would appear to us that if the barges were so engaged, their use would be extremely limited. In the context of this particular case, the complement of barges would have to be operated in the coastwise or inland waterway trade independently from its mother vessel, for that vessel is being built in Japan. The principal advantages obtained from the use of LASH barges would be lost if the barges were only devoted to inland waterway or coastwise trade for they are containers tailor-fitted to the mother ship. A LASH barge so used would merely serve as another run-of-the-mill barge; consequently much of its utility would be lost if it were diverted from use in conjunction with the mother vessel, its originally intended function. Armco does not seem to challenge this fact. It therefore does not follow that Central Gulf, or future shipowners, would award a contract for LASH barge construction to a domestic shipbuilder if foreign concerns could significantly underbid for such contracts, for the advantages of coastwise trade do not appear to offer a significant market for LASH barges. Whatever de minimis use idle LASH barges might be put to in the coastwide trade would not, in our opinion, so influence domestic shipowners that they would contract for their construction exclusively with domestic shipbuilders.
 
 
 20
 We conclude that there was substantial evidence before it for the Zones Board to conclude that a creation of a subzone for the construction of LASH barges would stimulate domestic shipbuilding by making it more economically attractive for shipowners like Central Gulf to contract with a domestic concern, like Equitable, than with a foreign shipbuilder. The wisdom of that decision is a matter better resolved by the agency Congress chose to implement the Act than by a court. See, e.g., Consolo v. Federal Maritime Commission, 383 U.S. 607, 619-621, 86 S.Ct. 1018, 16 L.Ed.2d 131 (1966).
 
 
 21
 Contrary to appellant's narrow view of the Foreign Trade Zones Act, Congress has delegated a wide latitude of judgment to the Foreign-Trade Zones Board to respond to and resolve the changing needs of domestic and foreign commerce through the trade zone concept. Because of the complexity and vagaries of our highly developed systems of trade, and the pressing needs for varying solutions to the problems that inevitably arise, it is imperative that the Board be permitted to experiment at the fringes of the tariff laws. As long as the Zones Board remains within the fringes and does not stray into areas clearly outside its delegated authority, a court should not interfere except for compelling reasons, not here presented.[13] In the final analysis the propriety of the flexibility built into the framework of the Act is a matter that must be addressed to Congress.
 
 III.
 
 22
 The Foreign Trade Zones Act, 19 U.S.C. 81n, mandates:
 
 
 23
 Each zone shall be operated as a public utility * * * and the grantee shall afford to all who may apply for the use of the zone and its facilities and appurtenances uniform treatment under like conditions. * * *
 
 
 24
 Armco contends that the creation of the subzone for shipbuilding purposes violates the 81n mandate because only one concern, Equitable, presently has an exclusive right to use the subzone.
 
 
 25
 Armco misconceives the nature of a subzone for, as the lower court concluded, 'The sub-zone, as the name implies, is but a non-contiguous portion of the original general purpose zone established in 1947.' 303 F.Supp. at 269. Had the existing trade zone not been operating at full capacity and suitable shipbuilding facilities been available within its defined borders, there would have been no need to provide space and facilities elsewhere in the Port of New Orleans.[14] The Zones Board had ample basis to conclude that the original general purpose trade zone did not meet the 'convenience of commerce,' and therefore it was justified in establishing the subzone.[15]
 
 
 26
 We believe the Act's equal treatment requirement was met by the commitment the Board of Commissioners of the Port of New Orleans made in its subzone application:
 
 
 27
 Zone Grantee (New Orleans Board) is prepared to offer other sites that could be developed for similar purposes and is also ready and willing to work out arrangements with others who may have already developed sites for like activity.
 
 
 28
 Whatever future problems may arise from future applications for comparable subzones from Equitable's similarly-situated competitors the problems would not be unique to the field of administrative law and advisory opinions relative to them need not concern us now, nor indeed ever, unless a prejudicial discrimination occurs.[16]
 
 IV.
 
 29
 Armco urges us to hand down an interpretation of the Act that would prevent the construction of vessels in a foreign trade zone. Appellant argues that only 'articles' may be manufactured in a trade zone and, as 'vessels' have not been traditionally regarded as 'articles' within the meaning of the tariff laws, 'vessels' cannot be constructed in a trade zone.
 
 
 30
 We do not quarrel with appellant's proposition that 3 of the Act contemplates that only 'articles' may be manufactured in a zone, but we conclude that a non-self-propelled barge which is also a cargo container to be stowed aboard LASH ships is nevertheless an 'article.'
 
 
 31
 Nowhere in the Tariff Laws did Congress say or intimate that vessels are not articles per se. On the other hand, 19 U.S.C. 1202, General Headnote 5(e), states in relevant part:
 
 
 32
 * * * vessels * * * are not articles subject to the provisions of these schedules.
 
 
 33
 Armco would have us read this language '* * * vessels * * * are not articles (and therefore are not) subject to the provisions of these schedules.' We conclude that the plainer meaning of the language, in light of our futile attempt to divine a reasonable basis for Congress to exclude vessels from the products permitted to be manufactured in a trade zone, is merely that vessels are non-dutiable articles. Our conclusion is bolstered by reading the word 'articles' in 81c of the Foreign Trade Zones Act in pari materia with another portion of the tariff laws dealing with seizure and forfeiture of articles. Section 607 of the Tariff Act of 1930, 19 U.S.C. 1607, provides in part:
 
 
 34
 'If (the) value of such vessel, vehicle, merchandise, or baggage * * * does not exceed $2,500, the collector shall cause a notice of the seizure of such articles * * * to be published. * * *'Section 1608 provides:
 
 
 35
 'Any person claiming such vessel, vehicle, merchandise, or baggage may * * * file with the collector a claim stating his interest therein. Upon the filing of such claim, and the giving of a bond * * * conditioned that in case of condemnation of the articles so claimed the obligor shall pay all the costs * * *, the collector shall transmit such claim and bond, with a duplicate list and description of the articles seized, to the United States Attorney. * * *'
 
 
 36
 Without cogent reasons to construe the meaning of 'articles' differently at different places in the customs laws, we must conclude that Congress intended the word to be used in the same sense throughout.[17]
 
 V.
 
 37
 We also reject appellant's argument that the Act contemplates only 'light' manufacturing, and so barge construction of the type to be carried on in the subzone is not authorized.
 
 
 38
 In support of its claim Armco points to statements made by various Congressmen during hearings on the proposed 1950 amendment by which 'manufacturing' within the trade zones was authorized, that Congress did not contemplate that 'heavy industry or manufacturing activities' (1948 House Hearings 24), 'huge operations' (id. at 17), or 'extravagant manufacturing plan developments' (id. at 32) would result from the passage of the amendment. Appellant's reference to these statements, however, merely establishes that some legislators believed heavy manufacturing would not be feasible in trade zones and although this belief may be entitled to some weight in construing the Act, it is not reasonable to suppose that Congress would leave the broad term 'manufacturing' undefined and unqualified if it had intended strictly to forbid other than 'light' manufacturing activity within a trade zone. The Act reads, 'Foreign and domestic merchandise of every description * * * may * * * be manufactured (in a zone) except as otherwise provided in this chapter. * * *' 19 U.S.C. 81c. No-where does the Act limit the magnitude of manufacturing allowed in a zone. Even if we could discern ambiguity in the disputed term, the Board's long standing interpretation, which we find to be a reasonable one, allowing 'heavy' manufacturing to be conducted within trade zones[18] is entitled to great weight.[19]
 
 VI.
 
 39
 Finally, appellant claims that vessel construction is not 'manufacturing' within the meaning of 3 of the Act. We conclude that the term 'manufacturing,' while capable of a wide scope in meaning, is suited to encompass the assembly-line construction of a fleet of barges for use as containers aboard LASH vessels. We need not decide at this time whether other types of shipbuilding should logically fall within its definition, but it appears to us that, policywise, a narrow construction of the word is not necessarily indicated.
 
 
 40
 Affirmed.
 
 
 
 *
 Of the Southern District of New York, sitting by designation
 
 
 [1]
 See 19th Ann.Rep. of the Foreign Trade Zones Board (1957) for additional examples of the duty savings techniques made possible by Free Trade Zones
 
 
 [2]
 Central Gulf is an unsubsidized U.S. Flag carrier operating out of U.S. ports to points in the Mediterranean and the Red Seas, the Persian Gulf, India and Pakistan. As an unsubsidized line it must carry on business without the benefit of operating or ship construction subsidies from the Government
 
 
 [3]
 In this particular case a subzone was needed because the foreign trade zone already in existence in New Orleans did not have the room or the facilities for a shipyard suitable for the construction of vessels planned by Equitable
 
 
 [4]
 The contract between the parties provided that if the free trade subzone the New Orleans Board was applying for did not materialize, the price of the barges would be increased by the amount of the duty levied on the Japanese steel
 If the barges were to be built by Equitable with domestic steel (no tariff) the total steel cost would be $2,430,000 ($10,428 per barge). Using foreign steel imported into the United States (7 1/2% Tariff) the total steel cost would be $1,935,000 ($8,305 per barge). The total steel cost using foreign steel in a foreign trade zone (no tariff) was computed to be $1,800,000 ($7,725 per barge).
 
 
 [5]
 Previous to its subzone application of March 18, 1968 the New Orleans Board had leased for a period of 50 years (commencing on January 1, 1967 and ending on December 31, 2016) a 38-acre area of harbor property to Equitable for its shipyard. The proposed subzone site was 3.64 acres of this shipyard property. As the New Orleans Board was the applicant and the proposed grantee of the subzone, Equitable leased the 3.64-acre tract back to the Board. It was agreed, however, that upon establishment of the subzone Equitable would be allowed to occupy and utilize the site for construction of the LASH barges. Armco claims this arrangement shows that Equitable was the 'real' applicant and proposed grantee of the subzone, a contention which we reject. See note 16 infra
 
 
 [6]
 The Examiners Committee, consisting of a Chairman, Sidney R. Donner of the Office of Industrial Analysis, U.S. Department of Commerce, Charles W. Fisher, Acting District Director of Customs of New Orleans, and Colonel Thomas J. Bowen, U.S. Army District Engineer of New Orleans, was appointed by the Executive Secretary of the Foreign-Trade Zones Board pursuant to the Trade Zone Regulations, 15 C.F.R. 400.1308, to investigate and report its findings to the Zones Board
 Evidence was introduced and arguments were presented at the hearing by representatives of the New Orleans Board, Equitable, Central Gulf, and others in favor of the subzone proposal, and by representatives of Armco, Bethlehem Steel Corporation, and the Shipbuilders Council of America in opposition to it.
 
 
 [7]
 The Foreign-Trade Zones Board consists of the Secretary of Commerce, who acts as Chairman and executive officer, the Secretary of the Treasury, and the Secretary of the Army. These individuals were the named defendants in this action along with the Executive Secretary of the Zones Board
 
 
 [8]
 Section 883 provides in pertinent part:
 No merchandise shall be transported by water * * *, on penalty of forfeiture thereof, between points in the United States * * *, either directly or via a foreign port * * *, in any other vessel than a vessel built in and documented under the laws of the United States and owned by persons who are citizens of the United States. * * * Therefore, if foreign built LASH ships and barges are used to transport merchandise destined for delivery at a foreign destination even though intermediate stops to pick up cargo so destined occur between points in the United States, the prohibition of 883 does not apply. Cf. The Bermuda, 70 U.S. 514, 3 Wall. 514, 18 L.Ed. 200 (1865).
 
 
 [9]
 See note 8 supra
 
 
 [10]
 Of course, this improvement in our balance of payments situation would probably result even if the subzone had not been created. Presumably the LASH barges would be built in foreign shipyards if U.S. shipbuilders could not meet the foreign competition, but, in any event, it is the impact of the LASH concept on overseas commerce, no matter where the vessels are built, that may have an alleviating effect on our balance of payment problem with respect to goods exported
 
 
 [11]
 It was also thought that in the future domestic shipbuilders, like Equitable, could become sufficiently competitive to solicit foreign orders for vessel construction because of improved technology gained through experience and the competitive advantage of the free trade zone
 Armco contends that it is unlikely that the cost of domestic LASH barge construction could realistically compete with foreign building costs. It cites the Senate Report to the 1960 amendment of the 1936 Merchant Marine Act which stated, 'the shipbuilding differentials between United States and foreign shipyards began exceeding 50 percent.' 1964 U.S.Code Cong.Adm.News, p. 2605. At the Examiners Committee hearings in this case, however, it was pointed out that the 50% Differential relates to liner construction, and inasmuch as barge construction will utilize production line techniques not used in the construction of larger vessels, the cost differential referred to above is 'substantially different.' Transcript of hearings p. 143.
 
 
 [12]
 See footnote 8, supra
 
 
 [13]
 As stated in Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965):
 'When faced with a problem of statutory construction, this Court shows great deference to the interpretation given the statute by the officers or agency charged with its administration.'
 See, e.g., Power Reactor Development Co. v. International Union, etc., 367 U.S. 396, 408, 81 S.Ct. 1529, 1535, 6 L.Ed.2d 924 (1961); Norwegian Nitrogen Co. v. United States, 288 U.S. 294, 315, 53 S.Ct. 350, 77 L.Ed. 796 (1933); Logan v. Davis, 233 U.S. 613, 627, 34 S.Ct. 685, 58 L.Ed. 1121 (1914).
 
 
 [14]
 The general purpose free trade zone located in the Port of New Orleans was established in 1947. During fiscal 1967, for example, the zone served 128 private business firms, 18 of which occupied zone facilities on a continuous basis
 
 
 [15]
 Section 81b(b) of the Act provides that additional trade zones may be authorized by the Zones Board if existing zones 'will not adequately serve the convenience of commerce.'
 Subzones have been authorized by the Zones Board to be operated by private concerns but to be maintained under the ultimate responsibility of public or quasipublic corporations. For instance, in Taft, Louisiana, about 25 miles from New Orleans, subzone status was created to contain a petrochemical manufacturing plant to be run by Union Carbide Corporation. Union Carbide will utilize the zone, a 79-acre tract, to import duty-free oil from overseas, to refine and to export and import the resulting petrochemical products. Other subzones have been established for various manufacturing purposes in Puerto Rico and San Francisco.
 
 
 [16]
 Another point raised tangentially to the above challenge to the subzone's legality has little merit. Armco contends that, in effect, Equitable was the 'real' applicant and operator of the subzone and, as it is not a public utility or a public corporation, it is ineligible to become a grantee of 'the privilege of establishing, operating, and maintaining a foreign-trade zone.' 19 U.S.C. 81a(e), (f), (h). See note 5 supra. That Equitable and Central Gulf thought of the plan and that they requested the Board of Commissioners of the Port of New Orleans to apply for the subzone grant does not make the grant to the Board illegal. There is no evidence that the New Orleans Board is not ultimately responsible for the establishment, operation and maintenance of the subzone and that consequently it is the real grantee. Appellant's contention ignores the practical operation of the Act
 
 
 [17]
 In support of its contention that vessels are not 'articles' Armco cites an early Supreme Court decision, The Conqueror, 166 U.S. 110, 17 S.Ct. 510, 41 L.Ed. 937 (1897), which held that a yacht was not a dutiable item under the customs law of the period. Suffice it to say that language in that case indicating that vessels are not 'articles' concerned categories established by the tariff laws of that era and is not pertinent to the much altered and expanded tariff laws of today
 
 
 [18]
 See note 15 supra
 
 
 [19]
 See cases cited in note 13 supra