**MIAMI FREE ZONE CORPORATION,**
**Plaintiff–Appellant,**

v.

**FOREIGN–TRADE ZONES BOARD,**
**United States Department of Commerce**
**and the United States, Defendants–Appellees,**

**and**

**Wynwood Community Economic Development Corporation, Inc. and Dade Foreign Trade Zone, Incorporated, Defendants.**

No. 97–1207.

United States Court of Appeals,
Federal Circuit.

Feb. 19, 1998.

Ronald W. Gerdes, Sandler, Travis & Rosenberg, P.A., Miami, FL, argued for plaintiff–appellant. With him on the brief were Edward M. Joffee and Gilbert Lee Sandler.

Bruce N. Stratvert, Attorney, Civil Division, Intern. Trade Field Office, U.S. Department of Justice, New York City, argued for defendants–appellees. With him on brief were Frank W. Hunger, Assistant Attorney General, David M. Cohen, Director, Washington, DC, and Joseph J. Liebman, Attorney in Charge, Intern Trade Field Office. Counsel on brief was Robert J. Heilferty, Attorney, Office of General Counsel, U.S. Department of Commerce, Washington, DC.

Before MAYER,\* Chief Judge, LOURIE and CLEVENGER, Circuit Judges.

CLEVENGER, Circuit Judge.

Miami Free Zone Corp. (MFZ), which operates a foreign-trade zone in the Miami, Florida, Customs port of entry, appeals the judgments of the Court of International Trade in *Miami Free Zone Corp. v. Foreign–Trade Zones Board,* 914 F.Supp. 620 (Ct. Int'l Trade 1996) (*Miami I*), and *Miami Free Zone Corp. v. Foreign–Trade Zones Board,* 945 F.Supp. 273 (Ct. Int'l Trade 1996) (*Miami II*). In these decisions, the court affirmed the action of the Foreign–Trade Zones Board (Board) granting a foreign-trade zone in the Miami port of entry to Wynwood Community Economic Development Corp. (Wynwood). On appeal, MFZ contends that the process by which the Board granted the Wynwood zone violated MFZ's constitutional right to due process, and that the Board failed to comply with 19 U.S.C. § 81b(b) (1994), which governs whether the Board may grant an additional free-trade zone for a port of entry that already has at least one. Because the Board provided MFZ with constitutionally adequate pro-

---

\* Chief Judge Haldane Robert Mayer assumed the position of Chief Judge on December 25, 1997.

cess and complied with its statutory mandate, we affirm.

## I

A foreign-trade zone is a geographical area located adjacent to or in a port of entry into the United States in which imported merchandise may be manipulated and manufactured "without being subject to the customs laws of the United States." Foreign–Trade Zones Act of 1934, § 3, 19 U.S.C. § 81c (1994) [hereinafter Act]. *See generally Armco Steel Corp. v. Stans,* 431 F.2d 779, 781–82 (2d Cir.1970). Foreign-trade zones are valuable, for example, because:

> A company operating within [a] zone can import foreign merchandise into the zone and manufacture finished merchandise therefrom. It can elect whether to pay duties on the foreign merchandise when it is imported into the zone, or on the finished merchandise when it is imported into U.S. customs territory for domestic consumption. The company can thus take advantage of any favorable differential between the rate of duty for the foreign merchandise and that for the finished merchandise.

*Conoco, Inc. v. United States Foreign–Trade Zones Bd.,* 18 F.3d 1581, 1583 n. 2 (Fed.Cir. 1994) (citation omitted).

Under 19 U.S.C. § 81b(a), the Board has the authority "to grant to corporations the privilege of establishing, operating, and maintaining foreign-trade zones." When a foreign-trade zone already exists within a port of entry, the Act provides that the Board may grant a foreign-trade zone "only if the Board finds that existing or authorized zones will not adequately serve the convenience of commerce." 19 U.S.C. § 81b(b).

## II

On October 17, 1990, Wynwood filed an application with the Board for a general-purpose foreign-trade zone in the Miami Customs port of entry, which is located in the City of Miami. The city donated a thirteen-acre site, which is two miles from the Miami seaport and falls within a state-designated enterprise-zone area. The Wynwood application received support from federal, state, and local elected officials. The notice of the application was published on October 26, 1990, at 55 Fed.Reg. 43,152. The Board appointed an Examiners Committee to report on the application and requested written comments from the public by December 14 of that year.

On that date, MFZ filed a comment, in which it objected to the application and requested a hearing. MFZ operates foreign-trade zone No. 32, which is located near the Miami International Airport and ten miles from the seaport. The Board had granted foreign-trade zone No. 32 to the Greater Miami Chamber of Commerce, which had contracted with MFZ to operate it. In March 1990, MFZ obtained an expansion site for the zone, because the existing site was unable to accommodate any more zone activity.

In addition to zone No. 32, foreign-trade zone No. 166 is adjacent to the Miami Customs port of entry. Zone No. 166 is located at Homestead, Florida, which is approximately 24 miles from the seaport. In 1990, the Board granted zone No. 166 to Vision Foreign Trade Zone, Inc. (Vision). *See* 55 Fed.Reg. 34,584 (1990). Vision supported the Wynwood application.

After the close of the comment period for Wynwood's application on December 14, 1990, both Wynwood and MFZ submitted comments that the Board accepted for consideration. Wynwood filed four such comments, the last of which was dated August 1, 1991, and MFZ filed three such comments, the last of which was dated August 8, 1991. In its comments, MFZ proposed, among other things, that the Wynwood zone be established under the grant for foreign-trade zone No. 32 having MFZ as the operator.

On November 18, 1991, the Board approved the Wynwood application and granted foreign-trade zone No. 180. To explain its decision, the Board released an Examiners Committee report. MFZ sought relief from the Court of International Trade, which has jurisdiction over Board decisions under 28 U.S.C. § 1581(i)(1), (4) (1994).

## III

Before the court, MFZ advanced two arguments. First, MFZ argued that the process by which the Board had decided to grant foreign-trade zone No. 180 violated its right to due process under the Fifth Amendment of the U.S. Constitution. Due process required, MFZ asserted, the Board to convene a hearing on the application. Second, MFZ contended that the Board had failed to fulfill the statutory prerequisites of 19 U.S.C. § 81b(b) when it granted foreign-trade zone No. 180. MFZ argued that the Board had misinterpreted the "convenience of commerce" requirement of section 81b(b), and had acted arbitrarily and capriciously in applying that section.

In *Miami I,* the court held that, even if MFZ had a protectable property interest in foreign-trade zone No. 32, the Board had not deprived MFZ of due process. Consequently, the Board denied MFZ's request for an evidentiary hearing. *See Miami I,* 914 F.Supp. at 627–28. With respect to MFZ's statutory complaint, the court was unable to determine if the Board had complied with section 81b(b) on the basis of the Examiners Committee report. As a result, the court remanded the case "so that the Board may explain fully its basis for approving the Wynwood application and point out what evidence on the record it relied upon in reaching that determination." *Miami I,* 914 F.Supp. at 630.

The Board subsequently prepared a Remand Determination, dated February 8, 1996, to comply with the remand in *Miami I.* In its Remand Determination, the Board explained why it found that foreign-trade zones Nos. 32 and 166 will not adequately serve the convenience of commerce. The Board set forth four factors upon which it relied:

(1) international trade is increasing in the Port of Miami; (2) the desire for zone services in the Wynwood area has been expressed; (3) [foreign-trade zone] No. 32 would not experience significant competitive effects from the creation of a [foreign-trade zone] in Wynwood; and (4) officials of the state and local governments support efforts to promote economic development in Wynwood.

*Id.* at 276 n. 2. In *Miami II,* the court reviewed the Board's Remand Determination and held that the Board had satisfied section 81b(b) and had not acted arbitrarily and capriciously. *See Miami II,* 945 F.Supp. at 280–81.

MFZ appeals the court's judgments in *Miami I* and *Miami II.* We have jurisdiction under 28 U.S.C. § 1295(a)(5) (1994).

## IV

We review Board action under section 706 of Title 5, which requires us to set aside the Board's grant of foreign-trade zone No. 180 if it was " 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law' or if the action failed to meet statutory, procedural, or constitutional requirements." *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 414, 91 S.Ct. 814, 822, 28 L.Ed.2d 136 (1971) (*quoting* 5 U.S.C. § 706(2)(A) and citing § 706(2)(B)-(D)); *see also Conoco, Inc. v. United States Foreign–Trade Zones Bd.,* 855 F.Supp. 1306, 1309–11 (Ct. Int'l Trade 1994) (using this standard to review Board action). With respect to the Act, we also note that "Congress has delegated a wide latitude of judgment to the Foreign–Trade Zones Board to respond to and resolve the changing needs of domestic and foreign commerce through the trade zone concept." *Armco Steel,* 431 F.2d at 788; *see also Citgo Petroleum Corp. v. United States Foreign Trade–Zones Bd.,* 83 F.3d 397, 400 (Fed.Cir.1996) ("Congress granted the Foreign–Trade Zones Board very broad regulatory authority over foreign-trade zones....").

### Due Process

Before us, MFZ renews its contention that the Board violated MFZ's constitutional right to due process. MFZ asserts that the Board's decision to grant foreign-trade zone No. 180 affected a protected property right, which is MFZ's interest in zone No. 32. By accepting submissions after the 45–day comment period had expired and by refusing to hold a public hearing before granting zone No. 180, MFZ posits, the Board failed to provide constitutionally adequate process.

For legal support, MFZ relies on the tripartite test that the Supreme Court has used to determine what process is due in any particular situation. *See, e.g., Zinermon v. Burch,* 494 U.S. 113, 127, 110 S.Ct. 975, 984, 108 L.Ed.2d 100 (1990); *Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976). The three factors are (1) the "private interest" at stake, (2) the "risk of an erroneous deprivation" and the "probable value" of additional process, and (3) the "Government's interest," which includes any "administrative burdens" that additional process would impose. *Zinermon,* 494 U.S. at 127, 110 S.Ct. at 984. MFZ contends that a predeprivation hearing would reduce the risk of erroneous deprivation and would have significant probative value because MFZ would be able to respond to arguments that were adverse to its position, and would not unduly burden the Board. Due process, MFZ urges, calls for an evidentiary hearing before the Board decides whether the existing foreign-trade zones in and around the Miami Customs port of entry adequately serve the convenience of commerce.

MFZ's argument persuades us no more than it did the Court of International Trade. Even if we were to agree with MFZ that its interest in foreign-trade zone No. 32 amounts to a protectable property interest under the U.S. Constitution, a question that we need not reach to decide this issue, we rule that the Board provided constitutionally sufficient due process. MFZ had adequate notice of the comment period from the Federal Register notification, and a full and adequate opportunity to be heard during the 45-day comment period. MFZ's accusation that the Board's procedures were deficient because the Board accepted comments after the close of the comment period does not rise to the level of a constitutional violation, because MFZ also submitted late comments that the Board accepted. As the Court of International Trade remarked, "[i]f [MFZ] was submitting post-comment period comments, it should have been aware that Wynwood was able to make similar submissions, and should not now complain that Wynwood availed itself of the same opportunity." *Miami I,* 914 F.Supp. at 628 (footnote omitted).

MFZ's insistence that due process mandated a predeprivation hearing is also wrong. Under the pertinent regulations, the Board may, but is not required, to hold a hearing before deciding whether to grant a foreign-trade zone. *See* 15 C.F.R. §§ 400.1305, .1309, .1315 (1990). MFZ has not argued that these regulations are unconstitutional, only that due process necessitated a hearing here. Due process, however, does not require a hearing in addition to a notice and comment period in this situation. The *Zinermon* and *Mathews* test does not compel a hearing, for the three factors are as readily marshaled to argue against having an evidentiary hearing as for it. As the Court of International Trade reasoned, MFZ had the opportunity to present its arguments during the extended notice and comment period, *see Miami I,* 914 F.Supp. at 628, and a hearing would, despite MFZ's declarations to the contrary, add to the Board's administrative burden.

In our view of this jurisprudence, the circumstance here is not equivalent to those situations in which the U.S. Supreme Court has held that due process requires a hearing before an agency acts so as to affect a protected property interest. *See, e.g., Zinermon,* 494 U.S. at 127–28, 110 S.Ct. at 984–95 (discussing cases that considered a due process claim). MFZ has not pointed us to any similar cases that were decided as MFZ desires. *Zinermon* involved the question whether the deprivation of the petitioner's liberty by involuntary confinement in a state mental hospital without a predeprivation hearing stated a claim of a due process violation. *See* 494 U.S. at 123–24, 110 S.Ct. at 981–83. *Mathews* held that no predeprivation hearing was required before the termination of disability benefits. *See* 424 U.S. at 349, 96 S.Ct. at 909–10. We therefore affirm the judgment in *Miami I* that there was no constitutional violation.

### *Section 81b(b)*

Section 81b(b) requires the Board to find, before it may grant a foreign-trade zone in or near a port of entry that already has one, that the existing foreign-trade zones "will not adequately serve the convenience of com-

merce." MFZ asserts that the Board erred in so finding. First, MFZ declares that the Board misconstrued the statutory phrase "convenience of commerce," and as a result, the Board acted outside its authority in granting foreign-trade zone No. 180. Second, MFZ asserts that the Board acted arbitrarily and capriciously in concluding that foreign-trade zones Nos. 32 and 166 will not adequately serve the convenience of commerce.

### A

■ In arguing that the Board acted outside its statutory authority, MFZ asserts that, under the Act, the statutory term "commerce" should be understood to extend only to foreign trade. To support this construction, MFZ quotes two congressional reports on the Act, which state that its purpose is to "expedite and encourage foreign commerce." S.Rep. No. 73–905, at 1 (1934); H.R.Rep. No. 73–1521, at 1 (1934). According to MFZ, by relying on factors not involving foreign trade in determining that the foreign-trade zones already present will not adequately serve the convenience of commerce, the Board violated section 81b(b). Specifically, MFZ alleges, the Board based its action in part on two findings from the Remand Determination that are unrelated to foreign commerce—the finding that the Wynwood area needs the services of a foreign-trade zone, and the finding that the Wynwood application had significant political support. MFZ contends that these two findings manifest an effort to improve the domestic economy by siting a foreign-trade zone in Wynwood. Such a purpose, MFZ affirms, contravenes Congress's intent under the Act.

■ To effect Congress's purpose for a statute, the plain and unambiguous meaning of the statute prevails unless there is clear legislative intent to the contrary. See, e.g., In re Alappat, 33 F.3d 1526, 1531 (Fed.Cir. 1994) (in banc); Amgen, Inc. v. United States Int'l Trade Comm'n, 902 F.2d 1532, 1538 (Fed.Cir.1990). If Congress "has directly spoken to the precise question at issue," then we and the agency "must give effect to the unambiguously expressed intent of Congress." Chevron U.S.A. Inc. v. Natural Re-

sources Defense Council, Inc., 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984); see also Arbor Foods Inc. v. United States, 97 F.3d 534, 538–39 (Fed.Cir.1996) (stating that we must defer to the agency's statutory interpretation) "if it 'reflects a plausible construction of the plain language of the statute and does not otherwise conflict with Congress' express intent.'" (quoting Rust v. Sullivan, 500 U.S. 173, 184, 111 S.Ct. 1759, 1767, 114 L.Ed.2d 233 (1991)). We do not accept MFZ's cramped interpretation, because Congress did not expressly limit the plain meaning of the term "commerce" as MFZ insists.

The second edition of the Merriam–Webster New International Dictionary of the English Language, which was published in 1934, the same year that the Act became law, gives the first definition of commerce to be: "Business intercourse; esp., the exchange or buying and selling of commodities, and particularly, the exchange of merchandise on a large scale between different places or communities; extended trade or traffic." Under the plain meaning of the term, "commerce" in section 81b(b) is properly understood to encompass both foreign and domestic commerce and, by necessity, includes the matters that affect such commerce. The Act presents no reason to limit "commerce" to concerns of foreign trade alone, and MFZ is wrong in arguing that consideration of domestic commerce is forbidden under section 81b(b).

The legislative history not only contains no contrary intention, but also obligates the Board to consider issues of domestic as well as foreign commerce in applying section 81b(b). MFZ's attempt to limit the purpose of the Act to foreign trade by quoting two congressional reports is unavailing. The passage that MFZ quotes became part of the preamble to the Act, which, in its entirety, states: "An Act [t]o provide for the establishment, operation and maintenance of foreign-trade zones in ports of entry of the United States, to expedite and encourage foreign commerce, *and for other purposes.*" Act, c. 590, 48 Stat. 998, 998 (emphasis added); S.Rep. No. 73–905, at 1 (1934); H.R.Rep. No. 73–1521, at 1 (1934). To argue, as MFZ

does, that the preamble limits the purpose of the Act is to ignore the concluding clause of the preamble. The legislative history does not explicitly address the term "commerce," for section 81b(b) (section 2 of the Act) was taken from the House version of the bill at conference without comment. *See* H.R.Rep. No. 73–1884, at 2 (1934). Despite this silence, the congressional debates make clear that the Act was intended to affect not only foreign commerce, but the domestic economy as well. *See* 78 Cong. Rec. H10,549–50 (daily ed. June 5, 1934); *id.* at H9762–80 (daily ed. May 28, 1934); *id.* at S8476–77 (daily ed. May 10, 1934). Members of Congress expressed their concern with how foreign-trade zones would affect domestic employment—a none-too-surprising result given the fact that the law was enacted in 1934:

> " [F]or example, mahogany logs could be brought from Central America, sawed into lumber, and then exported. The advantage is that *the labor* would be performed in the United States." 87 Cong. Rec. S8476 (daily ed. May 10, 1934) (statement of Sen. Copeland) (emphasis added).

> "One who has not been directly connected with international trade or marine problems can hardly appreciate the advantages which will accrue to American international commerce, as well as *domestic labor and industry,* from the establishment of foreign-trade zones in each and every port of the United States...." *Id.* at H9763 (daily ed. May 2, 1934) (statement of Rep. Welch) (emphasis added).

> "[The Act's] passage *will aid industry and labor.* It will also aid our international trade...." *Id.* at H9766 (statement of Rep. Doughton) (emphasis added).

> "I am supporting [the Act] ... because my suspicion is that wherever these free zones are established, *it will add some employment from the army of unemployed today.*" *Id.* at H9769 (statement of Rep. Dockweiler) (emphasis added).

The legislative history confirms that Congress intended to use the plain meaning of "commerce" in section 81b(b), which encompasses factors influencing both domestic and foreign commerce.

Because MFZ's interpretation of section 81b(b) is in error, its contention that the Board acted outside its statutory authority fails. Congress spoke precisely to the issue by using the term "commerce" and by not expressly limiting it. In applying section 81b(b), the Board's reliance on factors involving domestic as well as foreign commerce is consistent with, and gives effect to, this intent. As a result, the Board, in considering such matters, acted within its statutory authority.

**B**

 MFZ next disputes the Board's factual findings and judgment. In conducting our review under 5 U.S.C. § 706, "[a]lthough this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one." *Citizens to Preserve Overton Park,* 401 U.S. at 416, 91 S.Ct. at 824. We are "not empowered to substitute [our] judgment for that of the [Board]." *Id.* We agree with the Court of International Trade that the Board's grant of foreign-trade zone No. 180 was not arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law. *See Miami II,* 945 F.Supp. at 281.

MFZ does not quarrel with the Board's first finding from the Remand Determination that international trade is increasing in the Miami area. Instead, MFZ asserts that the Board erred in concluding that the growth in international trade means that the existing foreign-trade zones will not adequately serve the convenience of commerce. We disagree and conclude that the Board's reasoning was not arbitrary and capricious. The Board took note of the fact that other ports of entry in the United States have multiple foreign-trade zones to serve their commerce needs. The Board did not make an error of judgment in determining that the rising level of international trade provides a general basis for concluding that the two existing zones will not adequately serve the convenience of commerce.

With respect to the Board's second finding, MFZ complains that the Board was arbitrary and capricious in concluding that there was a need for foreign-trade zone services in the

Wynwood area. To the contrary, in the Remand Determination, the Board enumerated evidence that justifies this conclusion. First, a 190–company survey indicated that businesses that are doing international trade and that are not tenants of zone No. 32 expressed interest in having zone services in Wynwood. Zone No. 180 in Wynwood is two miles from the Miami seaport, whereas zones Nos. 32 and 166 are over 10 and 24 miles from the seaport, respectively. The survey companies indicated that the closer proximity of zone No. 180 to the seaport would better serve the trade that they ship by ocean freight. MFZ has not convinced us that the Board acted unreasonably in deciding that zones Nos. 32 and 166, because of their locations, will not adequately serve these businesses' commercial needs.

Finally, MFZ contends that findings three and four of the Board are irrelevant to the inquiry under section 81b(b). In finding three, the Board determined that a new foreign-trade zone would not competitively harm the existing zones in a significant fashion, and in finding four, the Board concluded that there was considerable political support for the Wynwood application resulting from an effort to improve the domestic economy by having a foreign-trade zone there. As we note above, matters affecting domestic commerce are properly before the Board, so these findings are within the Board's purview. MFZ has not shown that the Board acted arbitrarily and capriciously in making these findings, which provide additional support for the Board's conclusion that the existing foreign-trade zones will not adequately serve the convenience of commerce.

As 5 U.S.C. § 706 requires, we have conducted a "thorough, probing, in-depth review" of the Board's action. *Citizens to Preserve Overton Park*, 401 U.S. at 415, 91 S.Ct. at 823. In its Remand Determination, the Board indicated why the existing foreign-trade zones will not adequately serve both foreign and domestic commerce, and its explanation satisfies us that it acted reasonably in applying section 81b(b).

## V

Because the Board provided constitutionally ample due process and acted properly according to its statutory charge, we sustain its grant of foreign-trade zone No. 180.

*AFFIRMED.*